**In re Petition for DISCIPLINARY ACTION AGAINST Stephen C. DAVIS, an Attorney at Law of the State of Minnesota.**

**No. C5–97–567.**

Supreme Court of Minnesota.

Oct. 22, 1998.

**374**

Steven C. Davis, Edina, for appellant.

Edward J. Cleary, Kenneth L. Jorgensen, Office of Lawyers Prof. Resp., St. Paul, for respondent.

## OPINION

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility issued charges of unprofessional conduct against respondent, Stephen C. Davis, on December 4, 1996. These charges were based on conduct that a trial court had already concluded constituted serious breaches of respondent's fiduciary duties and multiple conflicts of interest. After unsuccessful attempts to serve respondent both by the mail and in person, the Director filed an application with the court on March 25, 1997, pursuant to Rule 12(c)(1) of the Rules on Lawyers Professional Responsibility (RLPR), requesting an order suspending respondent from the practice of law. We suspended respondent on August 13, 1997. In accordance with Rule 12(c)(2), RLPR, we subsequently ordered respondent to appear before this court on September 9, 1998, and show cause why appropriate disciplinary action should not be taken against him. Respondent did not move for vacation of the order for suspension or for leave to answer the disciplinary petition, and failed to respond to the order to show cause. We order respondent disbarred.

Respondent began representing Kay L. Fredericks in a marital dissolution proceeding in 1984 while a partner in the law firm of Katz, Lange, Davis & Manka, Ltd. Respondent became romantically involved with Fredericks that same year.

In November 1986, the dissolution proceedings concluded. As part of the dissolution agreement, Fredericks bought out her ex-husband and became sole owner and Chief Executive Officer of TREND Enterprises, Inc., a business that produced classroom aids and materials. Respondent drafted and negotiated the relevant security agreements, payments, and financing associated with the

sale. Respondent then prepared in December 1986 three separate agreements that retained the Katz firm to represent TREND "in connection with general litigation, consultation and support services" for the calendar years of 1987, 1988, and 1989, respectively. Fredericks signed these agreements, and TREND paid the Katz firm a retainer of $3,000 per month through March 1989. Respondent assumed the duties of acting Chief Operating Officer (COO) and General Counsel of TREND in 1987 and 1988.

Respondent convinced Fredericks in about 1988 that he had been under-compensated for the work he performed for her in her dissolution proceedings. Respondent persuaded Fredericks to agree to compensate for the "under-compensation" by making monthly payments of $2,500 from January 1988 to August 1992 for professional services on respondent's behalf to Innovative Ventures, Inc., a Minnesota corporation solely owned by respondent.

Respondent resigned from the Katz firm in 1989 and opened his own law firm, Stephen C. Davis, P.A. Fredericks retained Davis, P.A. to provide legal and consulting services. In August 1989, respondent joined TREND full-time as COO and General Counsel. Although now serving as General Counsel, respondent billed TREND a retainer of $500 a month from 1989 until at least June 1992, as well as separate bills for each legal service claimed to have been rendered to TREND. These amounts were paid to Davis, P.A. Respondent also billed TREND on an hourly basis for consulting services from February 1987 to August 1989.

Fredericks signed a "Memorandum of Understanding" in early 1990 purportedly transferring to respondent a phantom stock interest equivalent to a 33 to 50 percent interest in the value of TREND. The Memorandum was effective retroactively to April 30, 1986. (TREND had doubled or tripled in value between April 30, 1986, and the time the Memorandum was signed.) Respondent did not advise Fredericks to obtain separate legal counsel for herself or TREND before signing the agreement individually and on behalf of TREND. Respondent also did not advise either Fredericks or TREND of the conflicts of interests that existed, or the legal consequences of the Memorandum.

Respondent arranged to receive a cash payment of $100,000 as an "advance" under the Memorandum on or about September 1990. Respondent arranged a separate cash advance of $100,000 on or about June 5, 1991.

TREND paid respondent as COO and General Counsel a salary of at least $150,000 a year in addition to benefits and bonuses from August 1989 until about mid–1992. Respondent also made several unauthorized payments of TREND funds to himself without the knowledge or approval of Fredericks. These payments included at least $242,000, and bonuses totaling about $640,000.

TREND accepted respondent's resignation from TREND on October 7, 1992, and immediately relieved him of his duties. Fredericks and TREND subsequently brought an action in Hennepin County District Court against respondent individually, Davis, P.A., and Innovative Ventures, Inc., for breach of fiduciary duty, attorney misconduct, legal malpractice, conversion, unjust enrichment, accounting, and equitable forfeiture of compensation. After a five-week trial, the jury returned a special verdict on December 2, 1994, finding Davis breached his fiduciary duties both as a lawyer and as a corporate officer, agent, and employee, committed legal malpractice, and was liable for conversion and unjust enrichment.

The trial court issued its findings of fact, conclusions of law, and order for judgment on December 22, 1994. The court adopted the jury's findings of fact, and additionally found that "[t]he Memorandum of Understanding and Agreement was entered into by Davis in breach of his fiduciary duties as a lawyer and as a corporate officer, agent, and employee of TREND, it is grossly overreaching, one-sided, and unfair to Fredericks and TREND, and it is therefore void and of no legal effect whatsoever."

The trial court assessed damages against respondent totaling $1,830,300. This amount reflected $887,100 of compensatory damages and $943,200 of treble damages that were also assessed after the trial court found that respondent's breaches of his fiduciary duties

as a lawyer "were intentionally deceitful, dishonest, and fraudulent and were made with the intent to improperly obtain financial benefits for himself [and] to deceive TREND and/or Fredericks."

On May 30, 1995, respondent's motions for either judgment notwithstanding the verdict or a new trial were denied. Respondent did not appeal.

Respondent's counsel was served with Interrogatories in Aid of Execution and a Request for Production of Documents in Aid of Execution on February 17, 1995. Respondent's counsel advised the court on April 12, 1995, that he had not received any response from respondent with respect to the discovery requests, and withdrew from representing respondent on May 11, 1995. Respondent failed to comply with the district court's order compelling him to comply with Frederick's discovery requests, and failed to satisfy the judgment against him.

In November and December 1995, the Director's office received returned correspondence that had been directed to respondent at his former business address and his residence. Although both envelopes contained handwritten information stating that respondent was no longer at either address, neither was returned by the post office as either "undeliverable" or "forwarding address expired." Counsel for TREND/Fredericks have encountered similar difficulties in attempting to serve respondent with post-judgment motion papers. An investigation conducted by the Director's office indicated that respondent still resided at the residence in Edina, Minnesota, to which correspondence had been initially sent.

Furthermore, respondent's own conduct confirms that he still lived at this address. The Minnesota Attorney Registration Office received from respondent on or about December 5, 1996, respondent's annual attorney registration form and the accompanying registration fee. The fee statement had been sent in November 1996 to respondent's Edina address. The back of the form contained respondent's signature and that of his ex-wife who notarized his signature. Respondent's registration fee was paid by a check drawn on the account of his ex-wife and bearing the Edina address.

The Director issued charges of unprofessional conduct against respondent on December 4, 1996. These charges and a notice scheduling the pre-hearing meeting for December 17, 1996, were served on respondent by mail at his residence. The charges of unprofessional conduct were returned, after having been opened, to the Director's office on December 18, 1996. Handwritten on the envelope was "[n]ot at this address forwarding address unknown." The return of this and previous correspondence, despite the results of an investigation indicating the respondent still lived at the address, led the Director to conclude that respondent has been refusing and returning mail directed to him from the Director's office, or directing someone else to do so on his behalf.

Respondent failed to appear for the pre-hearing meeting and did not otherwise contact the Director's office concerning his inability to attend. The Director, in a petition dated February 4, 1997, petitioned this court to sanction respondent pursuant to Rule 12(c), RLPR. The petition alleged that respondent's conduct in regard to the TREND/Fredericks matter violated Minnesota Rules of Professional Conduct 1.7(a) and (b), 1.8(a) and (j), and 8.4(c). The petition further alleged that respondent's failure to cooperate with the Director's investigation violated Minnesota Rules of Professional Conduct 8.1(a)(3) and 8.4(d). The court granted the Director's petition by order dated May 6, 1997, and suspended respondent from the practice of law. Respondent has not moved the court since then for vacation of the suspension order or leave to answer the disciplinary petition.

■■■ The standard of proof required in attorney discipline cases is clear and convincing evidence. *In re La Chapelle,* 491 N.W.2d 17, 20 (Minn.1992). The respondent has failed to make any effort to respond to the disciplinary charges against him, despite the Director's attempts to contact respondent by personal service, mail, telephone, and publication. In similar prior cases, we have reviewed efforts by the Director to contact other respondents that were comparable to

those used in this matter, and have held that the Director took all reasonable steps to locate and notify a respondent. *See, e.g., In re Pottenger,* 567 N.W.2d 713, 716 (Minn. 1997); *In re Strom,* 551 N.W.2d 715, 717–18 (Minn.1996); *In re Morin,* 469 N.W.2d 714, 716 (Minn.1991). Rule 13(b), RLPR provides that where, as here, the respondent fails to answer, the allegations in the petition shall be deemed admitted. *See Pottenger,* 567 N.W.2d at 716; *Morin,* 469 N.W.2d at 716; *see also In re Sampson,* 408 N.W.2d 574, 577 (Minn.1987) (holding due process is not violated when failure to receive notice is the result of attorney's decision to abandon law practice). We conclude that the allegations establish that respondent's conduct violated Minnesota Rules of Professional Conduct 1.7(b) (representing a client if that representation may be materially limited by the lawyer's own interests), 1.8(a) (entering into a business transaction or acquiring an interest adverse to that of a client), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 8.1(a)(3) (knowingly failing to respond to a disciplinary authority's lawfully authorized demand for information), and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

■ Once the allegations of professional misconduct are deemed admitted, and the court has concluded that the conduct violated the rules of professional conduct, the only issue for the court to decide is the appropriate form of discipline. *See Pottenger,* 567 N.W.2d at 716. To determine the appropriate level of discipline, we consider these four factors: "the nature of the misconduct; the cumulative weight of the disciplinary violations; the harm to the public; and the harm to the legal profession." *In re Margolis,* 570 N.W.2d 688, 691 (Minn.1997) (citing *In re Jagiela,* 517 N.W.2d 333, 335 (Minn.1994)).

■ We have historically ordered disbarment for extensive misappropriation of client funds. *See In re Stroble,* 487 N.W.2d 869, 870 (Minn.1989). In fact, "[d]isbarment is the usual discipline for attorney misappropriation of client funds except in instances when the attorney presents clear and convincing evidence of substantial mitigating circumstances which show the attorney did not in-

tentionally convert the funds." *LaChapelle,* 491 N.W.2d at 21 (citing *In re Parks,* 396 N.W.2d 560, 562 (Minn.1986); *In re Fling,* 316 N.W.2d 556, 558 (Minn.1982)).

■ A jury has already determined that respondent was responsible for the conversion of hundreds of thousands of dollars from his clients, TREND and Fredericks. Other lawyers have been disbarred for misappropriating far smaller amounts of client funds than those involved in this matter. *See In re Grzybek,* 567 N.W.2d 259, 264 n. 1 (Minn. 1997) (reviewing a cross-section of misappropriation cases that resulted in disbarment). Respondent has offered no evidence whatsoever of mitigating circumstances which shows that the misappropriation was unintentional. Furthermore, respondent has failed to satisfy the judgment against him that seeks to restore to Fredericks and TREND the misappropriated amounts. Such "indifference toward restitution is an aggravating factor in determining discipline." *In re Swerine,* 513 N.W.2d 463, 467 (Minn.1994) (citing *Standards for Imposing Lawyer Sanctions,* Standard 9.22(j) (A.B.A.1991)).

We have also disbarred lawyers for serious violations of the rules against conflicts-of-interest and self-dealing. *See, e.g., In re Wyant,* 533 N.W.2d 397 (Minn.1995); *In re Vitko,* 519 N.W.2d 206 (Minn.1994). During the time period that respondent purported to represent the interests of TREND as both COO and General Counsel, he instead acted on numerous occasions to secure for himself large transfers of cash and stock interests that were grossly one-sided and intended solely for his own financial benefit.

■ Finally, respondent has purposely acted to evade service of process or other contacts from both the Director's office and his former clients, and has made no other effort to participate in the disciplinary proceedings or otherwise to cooperate. When considered in isolation, noncooperation with the disciplinary process has been found to warrant indefinite suspension from the practice of law. *See In re Cowan,* 540 N.W.2d 825, 827 (Minn.1995) (citing several decisions that imposed indefinite suspension on lawyers who failed to cooperate with the

disciplinary process). When considered in conjunction with other rule violations, non-cooperation with the disciplinary process increases the severity of the discipline imposed. *See In re Weems,* 540 N.W.2d 305, 309 (Minn.1995) (finding that lawyer's non-cooperation with the disciplinary process contributed to the cumulative weight of the disciplinary rule violations that compelled disbarment).

Respondent's egregious conduct warrants imposition of the most serious discipline. Accordingly, we order that respondent Stephen C. Davis be disbarred from the practice of law.

So ordered.